UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELVIN WOFFORD,

      Petitioner,

v.

JEFFREY WOODS, *Warden*,

      Respondent.

Case No. 16-cv-13083
Honorable Laurie J. Michelson

**OPINION AND ORDER**
**CONDITIONALLY GRANTING PETITION FOR A WRIT OF HABEAS CORPUS**

The Constitution guarantees a criminal defendant a unanimous verdict. That means when there is reason to think that 11 jurors are convinced of the defendant's guilt but one is steadfastly not, the judge should either instruct the jury to continue deliberations or declare the jury hung. What the judge cannot do is remove a competent juror who is simply unpersuaded by the prosecution's case.

Yet that is what happened at Petitioner Melvin Wofford's trial. Over the course of several days, the jury provided the judge with notes indicating that they were hopelessly deadlocked. One said, "We are eleven to one with no chance of the one moving their view." Another pleaded, "We have a hung jury and we need instructions!!! Help!!!" The judge twice instructed the jury to try to reach an agreement. Still no verdict came. Eventually, things got so bad in the jury room that the holdout retained an attorney to tell the judge that the other jurors were harassing and verbally abusing her (the judge had previously indicated that all notes had to come from the foreperson, which apparently, she was not). Despite that the jury had been stuck for days—and despite that the prosecution had agreed to a mistrial—the judge refused to declare one. Instead, he found that the

holdout juror's contact with an attorney "flagrantly" violated his instructions and thus she would be removed for cause. Once an alternate was seated, the reconstituted jury convicted Wofford in about 90 minutes. Wofford received a mandatory sentence of life in prison without the possibility of parole.

Wofford appealed, arguing that "remov[ing] a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." Yet the Michigan Court of Appeals did not address Wofford's claim that his Sixth Amendment right to a unanimous verdict had been violated. Wofford then asked the Michigan Supreme Court to take his appeal, again quoting the same language. The Michigan Supreme Court denied leave to appeal without reaching the merits.

Wofford now seeks a writ of habeas corpus from this Court. Because the state appellate courts did not address the claim Wofford presented, this federal court examines that claim in the first instance. Having done so, the Court finds that Wofford's Sixth Amendment right to a unanimous verdict was violated when the holdout juror was removed. So the Court will CONDITIONALLY GRANT Wofford a writ of habeas corpus.

## I.

### A.

In June 1993, Thomas Gilmore was assaulted and strangled to death at his place of work. Gilmore's business was at a converted school building that also housed other businesses, including a roofing company. Wofford worked for the roofing company. Although authorities investigated Gilmore's murder, DNA testing was not available in 1993 and the case ran cold. In 2009, Wofford's DNA was entered into a database and it matched DNA from the crime scene. Additional

samples from Wofford were tested to confirm the matches and, in 2012, Wofford was charged with first-degree premeditated murder and first-degree felony murder.

Wofford was tried in August 2013—two decades after Gilmore's death. Evidence suggested that the point of entry into the converted school building was a window partly covered by sheet metal. The sheet metal was secured in part by duct tape. Two hairs were found stuck to the duct tape and the jury was told that testing matched the hairs to Wofford. The jury was also told that the DNA testing matched two drops of blood found on a work-bench and a tool-room wall to Wofford. The prosecution also provided the jury with a motive: Wofford needed money, broke into the converted school building to steal, Gilmore spotted Wofford, and Wofford, afraid of being outed, killed Gilmore. On the other hand, the jury learned that a bloody palm print at the scene was not Wofford's. And they heard that shoeprints did not match the shoes Wofford was wearing when he was interviewed by police shortly after the murder. The jury was also read Wofford's grand-jury testimony where he denied killing Gilmore.

**B.**

Wofford's jury—or at least one juror—struggled to find that the evidence recounted above (and the other evidence presented at trial) proved beyond a reasonable doubt that Wofford murdered Gilmore. Here is what happened.

**1.**

By the afternoon of Monday, August 26, 2013, the jury had been deliberating for about seven hours. (R. 9, PageID.2086.) At that point, the judge received a note. (R. 9, PageID.2086.) The note read, "We are eleven to one with no chance of the one moving their view." (R. 9, PageID.2084.) The prosecution wanted the jurors to continue their deliberations. (R. 9,

PageID.2084, 2087.) After some discussion, Wofford's lawyers asked the judge to give the jurors a "deadlock instruction." (R. 9, PageID.2086.)

The judge agreed with the defense and read the jurors Michigan's deadlock instruction. In part, the judge told the jurors, "I'm going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able to reach a verdict. . . . As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness." (R. 9, PageID.2089.) The judge continued, "By reasoning the matter out jurors can often reach agreement. When you continue your deliberations do not hesitate to re-think your own views and change your opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement." (R. 9, PageID.2089.)

Just one hour later, the judge's clerk received another note from a juror. The note—which apparently did not come from the foreperson—read, "Excuse me, Judge, one of our jury's [*sic*] doubts are unreasonable, what do we do?" (R. 9, PageID.2091.) The judge did not directly answer the question. Instead, he told the entire jury that questions needed to come from the foreperson. (R. 9, PageID.2094.) And, apparently because the instruction had not been previously given (R. 9, PageID.2093), the judge further told the jury: "It is not proper for you to talk directly with the Judge, lawyers, court officers or other people involved in the case. As you discuss the case you must not let anyone, even me, know how your voting stands. Therefore, until you return with a unanimous verdict do not reveal this to anyone outside of the jury room." (R. 9, PageID.2094–2095.)

**2.**

By the afternoon of the next day, August 27, 2013, the judge had received three more notes. One was about the law of aiding and abetting. Another stated, "We the jury have a member who is not cooperating and refuses to deliberate or prove to us her vote. She just wants a hung jury. She also stated she had looked up the phrase to see what it meant before deliberation even started. Please advise us on what to do in this case." (R. 9, PageID.2367.) And the third note stated, "We have a Jury member who SERIOUSLY doesn't understand what REASONABLE DOUBT is!! We have a hung jury and we need instructions!!! Help!!!" (R. 9, PageID.2368.)

Wofford's counsel did not provide the court with an unequivocal position on how the court should move forward in light of the two notes about deliberations. Recalling the second note from the day before (the one not provided by the foreperson), defense counsel argued, "that note said that one of the jurors is not being reasonable in his doubt[,] our doubts, I believe was it, but they used the word 'his.'" (R. 9, PageID.2101.) Although the prior note did not disclose gender (*see* R. 9, PageID.2091), defense counsel continued based on the mistaken premise: "now [today's note is] referencing a female, which is different than I think—I think we're dealing with something different than yesterday based on that." (R. 9, PageID.2101.) Wofford's counsel continued, "Part of me wants to say mistrial." (R. 9, PageID.2102.) But then counsel added, "if it were eleven to one to acquit I might be—I don't know what I would be saying[.]" (R. 9, PageID.2102.)

Although defense counsel equivocated on mistrial versus more deliberations, counsel was unequivocal that substituting an alternate juror would risk a coerced verdict: "let's say you bring in an alternate tomorrow, human nature, we both know—we all know, jurors are going to say, the other eleven, hey, this one wouldn't cooperate, this one thought this—we had all agreed this way, and we kicked that person off because they didn't." (R. 9, PageID.2102.) Counsel asked, "Do you

really think you're going to get a fair and honest decision from that new juror that's brought in at that point and then put under the pressure of eleven people telling him whatever way they were going? I don't think that you would." (R. 9, PageID.2102.)

In the end, the judge decided to read the jury the aiding-and-abetting instruction, the reasonable-doubt instruction, an instruction about not seeking "outside" information, and "a secondary deadlock instruction," which, according to the judge, "mimic[ked] the mistrial standard." (R. 9, PageID.2105.)

The secondary deadlock instruction was quite similar to the first. Like before, the judge told the jury: "When you continue your deliberations do not hesitate to re-think your own opinions and change your opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching a verdict excuse me, reaching agreement." (R. 9, PageID.2111.) But, unlike the first deadlock instruction, the judge added, "It is my duty under the law to [e]nsure that you have engaged in full fledged deliberations while maintaining the integrity of the judicial system. Therefore, I need to determine whether there's any possibility, pursuant to the instructions I have just gave you, that you cannot ultimately reach and agree on a verdict." (R. 9, PageID.2111.)

**3.**

On the fourth day of jury deliberations, August 28, 2013, there were no notes from the jury regarding deadlock. (The jury did ask to see a shovel. (R. 9, PageID.2118.)) But this may have been due to the fact that the judge had told the jury that notes could only come from the foreperson and because the judge was not available to answer questions during the afternoon. (*See* R. 9, PageID.2111.)

**4.**

Just before noon the next day, August 29, 2013, an attorney appeared in the courtroom on behalf of one of the jurors. The attorney explained that a juror (which this Court will call "Juror M") had contacted him the prior afternoon. (R. 9, PageID.2116.) According to Juror M's counsel, "She said that she needed my help and that she was being harassed and verbally abused on a jury that she was sitting on. And we didn't discuss any of the facts of the case or discuss anything about a vote or anything like that[.]" (R. 9, PageID.2116.) Apparently unaware that the judge had previously told the jury that questions had to come from the foreperson, the attorney explained, "I just advised her that she should notify the Court through a note to the bailiff, or whoever was watching the jury, clerk[.]" (R. 9, PageID.2116.) The lawyer continued, "And then, you know, later on I talked to her . . . I said look, if you're uncomfortable . . . it was obvious she was uncomfortable . . . . I said, you give me permission, I can notify the Court, and after several discussions last night she instructed me to notify the Court." (R. 9, PageID.2117.) Juror M's counsel further explained, "I didn't know any of the facts. I don't—other than what was advised to me while we were in the hallway by [defense counsel], so I know nothing about the case other than what [defense counsel] had told me, and of course, none of that had—had been or has been discussed with [the juror]." (R. 9, PageID.2117.)

The prosecution, defense, and the judge then discussed what should be done. The prosecution's initial position was that "deliberations should continue." (R. 9, PageID.2118.) Wofford's counsel argued, "The concern would be, we know from Monday afternoon that they were eleven to one, whatever way. . . . We've read the deadlock instruction twice. Granted, since the second reading we didn't hear a thing from them yesterday, they asked only to see the shovel . . . . And then the video again this morning. . . . [W]hatever way she's at, obviously, we're

assuming she's the hold out, she's held out at least since . . . Monday afternoon. At what point do you a mistrial [*sic*] where it could be a coercive verdict and that it won't be what we want it to be, which is, you know, based on the evidence, her decision." (R. 9, PageID.2118–2119.)

After a bit more argument from defense counsel, the judge jumped in: "My query to both of you is, neither of you have mentioned that the contact [with the attorney] is a flagrant violation of the Court's instructions, cautionary instructions, which were not to discuss the case at all with anyone outside of the jury room . . . . [L]et's say she said and it's eleven to one or gone in detail, I think that would be certainly cause to excuse her from the jury without a blink of an eye." (R. 9, PageID.2119.) But then the judge said, "I'm not sure one way or the other at this point whether or not her violation constitutes cause to excuse her. . . . That's why I was asking a query." (R. 9, PageID.2119.)

Defense counsel responded, "The only reason I didn't address that is I guess I was thinking more in terms of discussing the facts of the case, not so much maybe what's going on in the jury room." (R. 9, PageID.2120.) Defense counsel continued, "I think at this time, your Honor, we would ask that the Court declare a mistrial, because I think that there's going to be issues whether it's a coercive verdict. I don't think that you can replace at this point with an alternate juror for the reason, like I indicated the other day, that if you were to bring in a new person the other eleven are going to be there and say we have one juror that was a problem." (R. 9, PageID.2120.)

The prosecution took the position that the juror had "violated the Court's order." (R. 9, PageID.2122.) But the prosecution also agreed with the defense that a mistrial was proper—with the caveat that the mistrial be declared a "manifest necessity" so that Wofford could be retried. (*See* R. 9, PageID.2121–2122.)

Despite that both the prosecution and defense asked for a mistrial, the judge refused to declare a mistrial. He explained in part, "I have two alternates that are out there. . . . [I]f somebody got hit by a bus this morning I would bring in the alternate juror. . . . I don't know what the difference is. Why should I declare a mistrial? [Defense counsel] is saying it's going to be coercive because we think that the person that's going to—we don't even know that the person that has written the letter is the holdout, we don't even know there is a holdout. For all we know it's six/six. . . . Or eight/two or eight/four or whatever it is." (R. 9, PageID.2122.) This last statement appears to have been based in part on defense counsel's earlier, mistaken representation that the August 26 note was about a male juror; the judge stated, "The first note was one gender, the second note was another gender. . . . [T]his is just pure rank speculation at this point." (R. 9, PageID.2123.) In the end, the judge ruled that there had been "a flagrant violation of this Court's jury instructions" justifying the juror's removal "for cause." (R. 9, PageID.2127.) To replace Juror M, the judge recalled one of the alternates. (R. 9, PageID.2128.)

Once the jury was reconstituted, the judge ordered the new group to "begin your deliberations anew." (R. 9, PageID.2138.) Yet in just over 90 minutes, the reconstituted jury found Wofford guilty of first-degree premeditated murder and guilty of first-degree felony murder. (R. 9, PageID.2139, 2141.)

Wofford's mandatory sentence was life in prison without the possibility of parole. (R. 9, PageID.2163.)

## C.

### 1.

In his petition for habeas corpus, Wofford states, "The jury became hostile and verbally abusive towards the holdout juror to such extent that on the third day of deliberations that juror

appeared in court with retained counsel. The court still refused to grant either the defense or prosecution's motion for a mistrial, but rather *dismissed the holdout juror* for cause, and replaced the juror with an alternate." (R. 1, PageID.40 (emphasis added); *see also* R. 1, PageID.41 ("[T]he trial court dismissed the holdout juror and replaced her with an alternate[.]").) Although Wofford, proceeding *pro se*, cites no law suggesting that a judge's removal of a holdout juror violated the Constitution, his counsel did cite on-point authority on direct appeal. In particular, Wofford's brief to the Michigan Court of Appeals quoted the following from *United States v. Thomas*: "'To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict. . . If the record raises any possibility that the juror's views on the merits of the case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed.'" (R. 9, PageID.2212 (quoting 116 F.3d 606, 621, 622 n.11 (2d Cir. 1997).) Thus, construing Wofford's *pro se* petition liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), Wofford claims that his Sixth Amendment right to a unanimous verdict was violated when the holdout juror was replaced by an alternate (*see* R. 1, PageID.40–41).

**2.**

There is support for this constitutional right among the federal courts of appeal.

In *United States v. Brown*, a juror in part indicated that he wanted to be discharged from deliberations because he did not agree with the law ("at this point I can't go along with that act") and in part indicated that he wanted to be discharged because he thought the government's evidence was insufficient for a conviction ("[i]f the evidence was presented in a fashion in which the law is written, then, maybe, I would be able to discharge my duties"). 823 F.2d 591, 594–95 (D.C. Cir. 1987). The trial judge removed the juror on the grounds that he "would not follow the

law" and the remaining eleven jurors voted to convict. *Id.* The D.C. Circuit reversed. Recognizing that granting a juror's request to be discharged on the basis that the juror was not convinced of the government's case would render the defendant's right to a unanimous verdict "illusory," but also recognizing that a trial judge cannot probe deeply into the juror's reasons for requesting discharge without "intrud[ing] on the secrecy of the jury's deliberations," the D.C. Circuit came up with a test that favored limited probing: "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id.* at 596. Turning to the facts before it, the court held, "Given the possibility—which in this case we think a likelihood—that [the juror's] desire to quit deliberations stemmed from his belief that the evidence was inadequate to support a conviction, we must find that his dismissal violated the [defendants'] right to a unanimous jury verdict." *Id.* at 597.

In *United States v. Thomas*—the decision Wofford flagged for the Michigan Court of Appeals and the Michigan Supreme Court—jurors indicated to the court that there were issues with how "Juror No. 5" was deliberating, including that his "predisposed disposition" was precluding a verdict. 116 F.3d 606, 611 (2d Cir. 1997). During *in camera* interviews, some jurors expressed that Juror No. 5 favored acquittal for reasons unrelated to the evidence (e.g., that the defendants needed to deal drugs out of economic necessity), while other jurors thought Juror No. 5 "was discussing the evidence." *Id.* at 611. The judge ultimately removed Juror No. 5, finding that he had "preconceived, fixed, cultural, economic, [or] social . . . reasons that are totally improper." *Id.* at 612. The remaining 11 jurors convicted. *Id.* at 612. The Second Circuit, adopting the test from *Brown*, vacated the convictions: "[W]e are required to vacate these judgments because the court dismissed Juror No. 5 largely on the ground that the juror was acting in purposeful disregard of the court's instructions on the law, when the record evidence raises a possibility that the juror

was simply unpersuaded by the Government's case against the defendants." *Id.* at 624; *see also id.* at 622 n.11 ("[I]f the record raises any possibility that the juror's views on the *merits of the case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed.").

The Ninth Circuit, after reviewing both *Thomas* and *Brown*, reached a similar conclusion on similar facts. In *United States v. Symington*, the jurors provided the court with a note stating that one juror, Cotey, was unable to deliberate because, among other things, she was incapable of focusing and recalling the topics that had been discussed. 195 F.3d 1080, 1083 (9th Cir. 1999). The jurors thought it best that Cotey be dismissed. *Id.* But upon questioning, some jurors indicated that "their frustration with Cotey may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views." *Id.* at 1084. The judge ultimately dismissed Cotey "for just cause for being either unwilling or unable to participate in the deliberative process in accordance with the instructions of the Court." *Id.* An alternate juror took Cotey's place, the reconstituted jury began deliberations anew, and the reconstituted jury convicted Symington. *Id.* On appeal, the Ninth Circuit, modifying *Brown* slightly, held that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Id.* at 1087. Because "there was a reasonable possibility that Juror Cotey's views on the merits of the case provided the impetus for her removal," her dismissal was improper. *Id.* at 1087; *see also Williams v. Cavazos*, 646 F.3d 626, 643 (9th Cir. 2011) ("It would . . . vitiate the essential role of a jury to act as a safeguard against both the power of the state and the court for a judge to selectively dismiss jurors based on the views of the merits of the case they express during

deliberations" (internal quotation marks omitted)), *rev'd on other grounds sub nom. Johnson v. Williams*, 568 U.S. 289 (2013).

**3.**

Despite that Wofford argued that the trial judge had wrongly removed a holdout and quoted the corresponding language from *Thomas* in his appellate brief, the Michigan Court of Appeals never even mentioned *Thomas* or the language he quoted. Nor did the state appellate court cite *Brown*, *Symington*, or a like case. And while it cited numerous decisions by Michigan courts, none of those decisions involved the test set out in *Brown*, *Thomas*, and *Symington*.

Perhaps the closest the Michigan Court of Appeals came to applying the law of those federal appeals cases was its application of *People v. Tate*, 624 N.W.2d 524 (Mich. Ct. App. 2001). *See Wofford*, 2015 WL 1214463, at *2 (quoting *Tate*, 624 N.W.2d at 529). The relevant portion of *Tate* states, "*while a defendant has a fundamental interest in retaining the composition of the jury as originally chosen*, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate." 624 N.W.2d at 529 (emphasis added). But the emphasized language apparently stems from a line of federal cases holding that once a jury is empaneled, the defendant has a right to conclude his jeopardy (i.e., that by declaring a mistrial too soon, a trial court may infringe the defendant's Fifth Amendment right to end his jeopardy). *See Tate*, 624 N.W.2d at 529 (citing *People v. Dry Land Marina, Inc.*, 437 N.W.2d 391, 392 (Mich. Ct. App. 1989)); *Dry Land Marina*, 437 N.W.2d at 392 (citing *United States v. Jorn*, 400 U.S. 470, 479 (1971)); *Jorn*, 400 U.S. at 479 ("The Fifth Amendment's prohibition against placing a defendant 'twice in jeopardy' represents a constitutional policy of finality for the defendant's benefit in federal criminal proceedings."). The Fifth Amendment right to avoid prolonged (or double) jeopardy is not the

same as the Sixth Amendment right to a unanimous verdict. Thus, this case is unlike *Johnson v. Williams*, where the Supreme Court reversed the Ninth Circuit's *de novo* application of *Symington*. *See* 568 U.S. 289, 305 (2013) (finding § 2254(d) applied where state court cited *Cleveland*, and, in turn, *Cleveland* discussed *Brown*, *Thomas*, and *Symington*).

In other words, the Michigan Court of Appeals never addressed "the merits" of Wofford's claim that his Sixth Amendment right to a unanimous verdict was violated. *See* 28 U.S.C. § 2254(d).

And neither did the Michigan Supreme Court. Because it was "not persuaded that the questions presented should be reviewed," *People v. Wofford*, N.W.2d 598 (Mich. 2015), it denied Wofford's petition without reaching the merits, *see Hickey v. Hoffner*, 701 F. App'x 422, 425 (6th Cir. 2017); *Hynes v. Birkett*, 526 F. App'x 515, 519 (6th Cir. 2013). And even if its unpersuaded-to-review language is somehow a merits decision, that decision presumably "adopted" the reasoning of the Michigan Court of Appeals. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). And, as just stated, the Michigan Court of Appeals never addressed the Sixth Amendment unanimous-verdict claim Wofford presented.

In sum, although this Court is to presume that state appellate courts address all the claims that a criminal defendant presents, this is the rare case when the claim was presented to the state courts but simply went unaddressed because similar—but constitutionally distinct—claims were also presented. *See Johnson*, 568 U.S. at 303 ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."). Because no state court addressed "the merits" of Wofford's claim that his Sixth Amendment right to a

unanimous verdict was violated by the removal of a holdout juror, 28 U.S.C. § 2254(d) presents no bar to relief.

## 4.

But that does not mean that this Court addresses Wofford's claim under *Brown*, *Thomas*, and *Symington* on a completely blank slate. In particular, under 28 U.S.C. § 2254(e)(1), this Court must "presume[]" that the factual findings of the Michigan Court of Appeals are correct unless they are rebutted by "clear and convincing evidence."

One finding is rebutted by clear and convincing evidence. Specifically, the Michigan Court of Appeals twice stated that there was "no evidence" of "what way the jury was leaning" or "the potential division" at the time Juror M was removed. *Wofford*, 2015 WL 1214463, at *2; *see also id.* at *3 ("[T]here is no evidence regarding what way the jury was leaning at the time of [Juror M's] removal."). It simply is not true that there was "no evidence" where the votes stood when Juror M was removed. The jury told the judge that it was 11 to 1 on Monday; later that same day a note referred to "one of our jury's [*sic*] doubts"; on Tuesday, one note again referenced a single juror and the other note not only referenced a single juror, but a single, female juror; on Thursday, an attorney said that a juror had reported that "she" was being harassed and verbally abused by the other jurors. So all along the way, there was but one holdout: Juror M. (As for the Michigan Court of Appeals' suggestion that it could have been 11 to 1 in favor of Wofford, the reconstituted jury's 90-minute conviction makes that inference unreasonable.)

The other two factual findings might not be rebutted by clear and convincing evidence. The Michigan Court of Appeals found that "the trial court did not remove [Juror M] because she was a lone hold-out who was standing in the way of conviction." *Wofford*, 2015 WL 1214463, at *2. It

also found that "the record clearly demonstrates that the trial court removed this juror because she flagrantly violated the court's instructions." *Id.* at *2.

This Court is skeptical. As just stated, it was obvious to all that from the time of the very first note, there was a single holdout. Consider too that the judge said, "I'm not sure one way or the other at this point whether or not [Juror M's] violation constitutes cause to excuse her," then, without any new insight from counsel on that particular issue, found that Juror M's conversation with an attorney "flagrant[ly]" violated his instructions. (R. 9, PageID.2128.) And if Juror M flagrantly violated the court's instructions by contacting an attorney, why were the notes from the jury indicating where they stood not also a "flagrant" violation of his instructions? Yet the foreperson was not removed.

The Court's skepticism aside, the trial judge's statements that a mistrial would be based on "speculation and conjecture about what's going on in the jury room" and that Juror M had flagrantly violated his instructions suggest that, *in the judge's mind*, Juror M was not the holdout and that, in his mind, the problem with Juror M was that she violated his instructions. Thus, this Court will presume that (1) "the trial court did not remove [Juror M] because she was a lone hold-out who was standing in the way of conviction" and (2) "the trial court removed this juror because she flagrantly violated the court's instructions," *Wofford*, 2015 WL 1214463, at *2. *See* 28 U.S.C. § 2254(e)(1).

But that presumption does not end the inquiry into whether removing Juror M violated Wofford's Sixth Amendment right to a unanimous jury. All that the Michigan Court of Appeals found was the reason the *judge* removed Juror M was because she violated his instructions. Yet the judge's thinking is not dispositive. Indeed, in each of *Brown*, *Thomas*, and *Symington*, the trial court stated on the record that the removal of the holdout juror was because the juror was unwilling

or unable to deliberate in accordance with the jury instructions; not one judge said removal was because the juror was a holdout. So in each of those cases it would have been accurate to say, just as the Michigan Court of Appeals said here, that "the trial court did not remove [the juror] because she was a lone hold-out" and "the trial court removed this juror because she flagrantly violated the court's instructions" (perhaps without the "flagrantly"). Indeed, in *Thomas*, the Second Circuit vacated the conviction while expressly declining to decide "whether the record reveals an intention on the part of the court to remove Juror No. 5 as a means of achieving jury unanimity." 116 F.3d at 624.

### 5.

Thus, even taking the facts as the Michigan Court of Appeals found them, this question remains: Does "the record evidence disclose[] [a] reasonable possibility that the impetus for [Juror M's] dismissal stem[med] from [her] views on the merits of the case?" *Symington*, 195 F.3d at 1087. In this Court's view, the answer to this question is "yes."

Consider the entire chronology. On the second day of deliberations, the jurors told the judge that they were "eleven to one with no chance of the one moving their view." (R. 9, PageID.2084.) This led to a deadlock instruction. But just an hour later, came a second note: "Excuse me, Judge, one of our jury's [*sic*] doubts are unreasonable, what do we do?" (R. 9, PageID.2091.) Then the next day, two more: "We the jury have a member who is not cooperating and refuses to deliberate or prove to us her vote" and "We have a Jury member who SERIOUSLY doesn't understand what REASONABLE DOUBT is!! We have a hung jury and we need instructions!!! Help!!!" (R. 9, PageID.2367–2368.) Then a day and a half later, following a second deadlock instruction, an attorney appears in court to tell the judge he is representing a juror who "was being harassed and verbally abused." (R. 9, PageID.2116.) Thus, the record evidence

17

establishes a reasonable possibility that what led to the notes, what led to Juror M contacting an attorney, and what put the issue of Juror M's removal before the judge was Juror M's views about the merits of the case. As the trial judge himself stated, "I've got a juror that's violated the instructions, she—obviously she felt compelled to do it." (R. 9, PageID.2123.) So even if the trial judge removed Juror M because she violated his instructions, *see* 28 U.S.C. § 2254(e)(1), there remains a reasonable possibility that the "impetus" for Juror M's removal was that she was the holdout, *see Symington*, 195 F.3d at 1088 n.9 ("[B]ecause it was reasonably possible that the problems all *stemmed* from the other jurors' disagreement with her position on the merits, it was error to continue the case without her." (emphasis added)).

Wofford was thus deprived of his Sixth Amendment right to a unanimous verdict and so the Court will grant Wofford the relief that the prosecution had agreed to years ago: a retrial.

That relief means that the Court need not address Wofford's other claims based on the jury's deliberations (e.g., that the trial court should have declared the jury hung at some point after the second deadlock instruction or that the reconstituted jury's guilty verdict was coerced). Success on these claims would at most entitle Wofford to a retrial.

## II.

But success on a sufficiency-of-evidence claim would end Wofford's jeopardy completely; so the Court must address that claim.

To assess a sufficiency-of-evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The *Jackson v. Virginia* standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson*, 443 U.S. at 319). The standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). And when, as here, a state court has ruled "on the merits" of a claim under *Jackson*, *see* 28 U.S.C. § 2554(d), "the law commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [Court of Appeals'] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* at 531.

Wofford points out that the palm print found at the crime scene did not match his palm print. (R. 1, PageID.47.) And he points out that the footwear impressions from the scene did not match the shoes he was wearing when the police interviewed him a day or so after Gilmore's death. (R. 1, PageID.47; *see also* R. 9, PageID.1692, 1820–1821, 1849.) He also points out that the two hairs and the blood with his DNA were all found in his general work area and that, in his line of work, it would not be unusual to sustain a cut. (R. 1, PageID.24, 46.) Further, Gilmore was apparently assaulted and strangled to death, yet samples of the blood taken from Gilmore's body did not turn up any of Wofford's DNA. (R. 9, PageID.1541–1542.) And on the night of Gilmore's murder, Wofford and a friend were out late drinking and at 8:30 a.m., the friend found Wofford asleep on the floor. (R. 1, PageID.48; R. 9, PageID.998.) Wofford was still wearing the clothes he had on the night before. (R. 1, PageID.48; R. 9, PageID.998.) Further, the jury heard Wofford's grand-jury testimony where he denied involvement. (R. 9, PageID.1795–1796.)

But this evidence does not show that the Michigan Court of Appeals unreasonably found that Wofford did not clear Jackson's "near[] insurmountable hurdle," *Lafler*, 658 F.3d at 531

(internal quotation marks omitted). *See* 28 U.S.C. § 2254(d). First consider motive. There was testimony suggesting that Wofford was short on money around the time of Gilmore's death. (R. 9, PageID.733–734.) And there was evidence suggesting that the person who broke in was someone familiar with the building (R. 9, PageID.PageID.679, 727, 849, 854, 956, 971, 1149–1151, 1967) and that Gilmore might have recognized Wofford (R. 9, PageID.1760). So the Michigan Court of Appeals was not unreasonable to find that a jury could have inferred that Wofford "had a motive to steal" and "had a motive to kill the victim because the victim could identify him." *Wofford*, 2015 WL 1214463, at \*4. Next consider opportunity. The friend that Wofford had gone to the bar with testified that around 2:30 or 3:00 a.m., Wofford said that "he had something to do." (R. 9, PageID.995–996.) And there was testimony that a dog not far from the place where Gilmore was killed went "ballistic" sometime between 1:00 and 4:00 a.m. (R. 9, PageID.1091–1092.) True, Wofford's friend was "foggy" from drinking that night. (R. 9, PageID.1063.) Even so, it was not unreasonable for the Michigan Court of Appeals to find that "[t]he jury could infer that [Wofford] committed the offenses between the time he left [his friend's] house and returned." 2015 WL 1214463, at \*4. Finally, given the DNA evidence showing that it was Wofford's hairs found on the duct tape, the Michigan Court of Appeals reasonably found that "[t]he jury could infer . . . that defendant entered through the metal-covered window, cut himself on the broken glass fragments, caught his hair on the duct tape that had secured the metal to the window[.]" 2015 WL 1214463, at \*3. A possible motive and opportunity, coupled with some DNA evidence that Wofford entered through the sheet-metal-covered window, made it reasonable for the Michigan Court of Appeals to find that "[s]ufficient evidence supported [Wofford's] conviction." *Id.* at \*4.

In short, 28 U.S.C. § 2254(d) bars relief on Wofford's claim that the evidence at trial was constitutionally insufficient.

**III.**

For the reasons given, the Court CONDITIONALLY GRANTS Wofford's petition for a writ of habeas corpus. Respondent is to serve a copy of this opinion and order on the Oakland County Prosecutor's Office and appropriate state court. Respondent shall release Wofford from custody unless the State brings him to trial again within 90 days from entry of this order. Pursuant to 18 U.S.C. § 3006A(a)(2)(B), the Court appoints the Federal Community Defender of the Eastern District of Michigan to represent Wofford in this habeas corpus proceeding only.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: November 5, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, November 5, 2018, by electronic and/or ordinary mail.

s/William Barkholz
Case Manager